```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------x

JAHMEL RIVERA,

                Plaintiff,              MEMORANDUM & ORDER
                                          20-CV-5501 (EK)

        -against-

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

-------------------------------------x
```

ERIC KOMITEE, United States District Judge:

Plaintiff Jahmel Rivera challenges the Social Security Administration's denial of his claim for disability benefits. Before the Court are the parties' cross-motions for judgment on the pleadings. Rivera argues that the agency's decision is not supported by substantial evidence and that the administrative law judge committed legal error by failing to account adequately for, and develop the record on, his seizure disorder. For the following reasons, this case is remanded for further proceedings.

## I.   Background

**A.   Procedural Background**

In July 2017, Rivera applied for benefits, alleging a disability onset date of January 1, 2016. Administrative Tr. ("Tr.") 15, ECF No. 9. The agency denied his claim. *Id.* at 12. On December 5, 2019, an administrative law judge held a hearing

on Rivera's claim. *Id.* at 15. The ALJ concluded that Rivera was not disabled and therefore not entitled to disability benefits. *Id.* at 23. The Appeals Council denied Rivera's request for review of the ALJ's decision, rendering it final. *Id.* at 1. Rivera timely sought review of that decision in this Court.

**B.   Evidence of Rivera's Seizure Disorder**

    1.   <u>Rivera's Testimony Before the ALJ</u>

At the hearing before the ALJ in December 2019, Rivera testified that he had petit mal seizures "approximately four times per week" — "[s]ometimes more," but "never less." *Id.* at 39.[1] He stated that the seizures cause him to feel weak and dizzy and leave him unable to stand. *Id.* The seizures themselves typically last between one and five minutes, but the symptoms last longer: approximately from forty-five minutes to twenty-four hours. *Id.* at 39-40. During the symptomatic period, Rivera testified, he is "incoherent" and "can't really do much more than" sit down. *Id.* at 40. Rivera also testified that the dosage of his then-current prescription medication (oxcarbazepine) had increased over time, and that the side effects included feeling "dull" or "not as sharp." *Id.* at 41.

---

[1] A petit mal seizure, or "absence" seizure, involves the disturbance of brain function and causes staring spells. *See* Def. Mem. in Supp. of Cross-Mot. for Summ. J. 2 n.2, ECF No. 16-1.

2

Moreover, he explained that while working his prior job as a retail manager, he "didn't know when [he] would have a seizure," and when a seizure did occur, he would miss work or arrive late. *Id.* at 36, 43.  Because those attendance issues resulted in "a lot of disciplinary action," he ultimately decided that he "had to quit."  *Id.* at 43.

2. Rivera's Medical Records

Rivera's medical records show that he suffered recurring seizures between 2017 and 2019.[2]  In January 2017, Marissa Modafferi — a physician assistant who had treated Rivera since 2011 — noted that Rivera reported "having more seizures and many breakthrough[s]" even while on a daily medication regimen of three doses of oxcarbazepine (600 milligrams in the morning and midday and 300 milligrams in the evening).  *Id.* at 354.[3]  In response, Modafferi increased the doses such that he would take 900 milligrams in the morning, 600 milligrams midday, and 900 milligrams in the evening.  *Id.* at 354-55.  Rivera had suffered "no adverse side effects" on the prior, lower-dose

---

[2] The medical records indicate that Rivera had a multi-year period — lasting approximately from 2012 until at least June 2016 — without seizures. *See id.* at 361 (May 2015 report: Rivera's "last seizure was about three years ago"); *id.* at 360 (December 2015 report: Rivera "is having no breakthrough seizures"); *id.* (June 2016 report: Rivera had "[n]o breakthrough seizures or grand mal seizures").

[3] The earliest report by Modafferi is dated July 7, 2011 and describes the visit as a "follow up."  *Id.* at 367-68.  Each of Modafferi's reports also contains the name of Dr. Stephen Kulick, M.D.  *See, e.g.*, *id.*

3

regimen. *Id.* at 354. Six months later, in July 2017, Modafferi noted that Rivera "is not missing any doses of medication" but nevertheless has "had a couple of breakthrough absence seizures." *Id.*[4]

Modafferi's 2018 reports similarly documented instances of recurring seizures even as Rivera maintained the same medication regimen. In March 2018, Rivera reported having "a couple of petit mal seizures" while still taking 900 milligrams of oxcarbazepine twice per day and 600 milligrams once per day. *See id.* at 417.[5] At that time, Rivera expressed interest in trying Oxtellar, a different epilepsy medication with an "extended release." *Id.* at 415. In September 2018, however, Modafferi explained that Rivera had "tried switching to Oxtellar," but that "he felt anxious on it and decided to stick with oxcarbazepine instead." *Id.* Modafferi also recorded that, while Rivera "continues to remain stable" on the oxcarbazepine regimen, he nonetheless "continues to suffer from petit mal seizures about 3-4 [times] a week which he is accepting at this time." *Id.*

---

[4] Modafferi's report states that Rivera was taking Oxtellar at that point, *see id.* at 354, but Rivera's "Current Medication List" shows that he was still taking oxcarbazepine as of July 31, 2017. *See id.* at 349. Moreover, the notes from Rivera's March 2017 EEG monitoring show that he was taking oxcarbazepine at that time. *See id.* at 419. Thus, the reference to Oxtellar in Modafferi's report appears to be a mistake.

[5] This report did not specify how often or over what period Rivera had those seizures.

Rivera's seizures persisted throughout 2019 as he remained on the same medication regimen. In a March 2019 report, Modafferi noted that Rivera "continue[s] to have some petit mal seizures on occasion" but "remain[s] stable" on the oxcarbazepine regimen. *Id.* at 413. Per the report, Rivera stated that "some days he would forget to take the afternoon dosage," but Modafferi did not address the extent to which those lapses may have contributed to his seizures. *Id.* The report went on to note that Rivera agreed to switch his medication to Oxtellar again. *Id.* at 413-414. But after Rivera's follow-up visit in October 2019, Modafferi wrote in her report (the most recent medical report in the record as of Rivera's hearing) that Rivera had "decided to hold off" on Oxtellar and "continue on his current regimen" of oxcarbazepine. *Id.* at 411. She stated that Rivera "remain[s] stable" on the oxcarbazepine regimen. *Id.* During that visit, Modafferi found that Rivera's condition was much the same as it had been in March. She again noted that Rivera "continue[s] to have some petit mal seizures." *Id.* at 411. Modafferi added, however, that "for the most part [the seizures] are under control." *Id.*[6] "[T]herefore," she stated, Rivera's treatment would continue "without change." *Id.*

---

[6] Modafferi offered no explanation for this assertion.

**C. The ALJ's Disability Evaluation**

Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Administration's regulations require ALJs to follow a five-step sequence in evaluating disability claims. 20 C.F.R. § 404.1520(a)(4).

First, the ALJ determines whether the claimant is engaged in substantial gainful activity. *Id.* § 404.1520(a)(4)(i), (b). If not, then at step two, the ALJ evaluates whether the claimant has a "severe impairment" — that is, an impairment or combination of impairments that "significantly limits" the claimant's "physical or mental ability to do basic work activities." *Id.* § 404.1520(c). If the ALJ identifies a severe impairment, then at step three, she must determine whether it meets or equals one of the impairments listed in Appendix 1 of the regulations (the "Listed Impairments"). *Id.* § 404.1520(d); 20 C.F.R. pt. 404, subpt. P, app. 1. If it does, the ALJ will deem the applicant disabled. 20 C.F.R. § 404.1520(a)(4)(iii).

Here, the ALJ determined that Rivera had not engaged in substantial gainful activity since his alleged onset date.

6

Tr. 17. The ALJ also determined that Rivera suffered from the "severe impairments" of epilepsy, sleep apnea, and obesity. *Id.* However, the ALJ concluded that none of these impairments rose to the level of a Listed Impairment. *Id.* at 18. The ALJ explicitly evaluated the applicability of one listing — Listed Impairment 11.02, which pertains to epilepsy. To meet that listing, a claimant must show that, despite adherence to prescribed treatment, he experiences "[g]eneralized" or "dyscognitive" seizures with a stated frequency. 20 C.F.R. pt. 404, Subpt. P, App. 1. While the ALJ did not directly address whether Rivera's generalized seizures recurred at the required frequency, she found that he was "able to control his seizures with prescription medication." Tr. 18.

When an ALJ finds that the claimant has severe impairments that do not meet the requirements of any Listed Impairment, she must determine a claimant's residual functional capacity ("RFC"), which is the most a claimant can do in a work setting notwithstanding his impairments. 20 C.F.R. § 404.1545(a)(1). In making this assessment, the ALJ considers multiple factors, including the medical evidence, nonmedical evidence, and the claimant's statements about what he is able to do. *See* 20 C.F.R. § 404.1545(a)(3). As part of this analysis,

7

the ALJ considers statements about the intensity, persistence, and limiting effects of symptoms. *Id.* § 404.1529.[7]

Applying these factors, the ALJ accepted that Rivera's "medically determinable impairments could reasonably be expected to cause [his] alleged symptoms." Tr. 20. Despite this, she concluded that Rivera's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent" with the record. *Id.* The ALJ thus determined that Rivera had the RFC to perform "light work" with limitations. *Id.* at 19.[8] Those limitations included that Rivera could only occasionally climb ramps or stairs consisting of a few steps ("but rarely full flights"), balance, stoop, kneel, crouch, and crawl. *Id.* Rivera also could never climb ladders, ropes, or scaffolds and must avoid all exposure to hazardous machinery, unprotected heights, and operational control of

---

[7] In evaluating symptoms or subjective complaints, the ALJ considers additional factors, including: (1) daily activities; (2) the location, duration, frequency, and intensity of the pain or other symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual is currently receiving or has received for relief of pain or other symptoms; (6) any measures the individual is using or has used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3).

[8] *See* 20 C.F.R. § 404.1567(b) (defining light work as work involving lifting up to 20 pounds, frequently lifting and carrying objects weighing up to 10 pounds, walking or standing "a good deal," and sitting frequently with some pushing and pulling of arm or leg controls); Social Security Ruling 83-10, 1983 WL 31251 (clarifying that the full range of light work requires standing or walking six hours of an eight-hour work day, and sitting intermittently during the remaining time).

8

moving machinery. *Id.* Apart from prescribing these limitations, the ALJ did not discuss the ways in which Rivera's seizure disorder might impede his ability to maintain gainful employment — for example, by necessitating breaks or absences when seizures manifested.

At step four, the ALJ considers whether, in light of the RFC determination, the claimant can perform "past relevant work." 20 C.F.R. § 404.1520(f). Here, the ALJ found that Rivera could perform his past work as a retail manager. Tr. 22. At step five, the ALJ evaluates whether the claimant can perform jobs existing in significant numbers in the national economy. 20 C.F.R. § 404.1520(g). The ALJ determined that Rivera could perform such jobs, including as a mail sorter, "shipping and receiving weigher," and "checker." Tr. 23.[9] The ALJ also determined that if Rivera were limited to sedentary work, he could work as a "charge account clerk," document scanner, and "weight tester." *Id.*[10] Based on these findings, the ALJ concluded that Rivera was not disabled. *Id.*

---

[9] A shipping and receiving weigher records the weight of containers, cargo, and the like. Dictionary of Occupational Titles ("DOT") Code 222.387-074. A checker may, for example, verify the quantity, quality, and condition of goods. DOT Code 222.687-010.

[10] A charge account clerk "[i]nterviews customers applying for charge accounts," reviews applications, and checks references, among other tasks. DOT Code 205.367-014. A weight tester operates a machine that weighs products and records variations in weight. DOT Code 539.485-010.

9

## II. Standard of Review

A district court has jurisdiction to review the final judgment of the Commissioner denying an application for Social Security disability benefits. 42 U.S.C. § 405(g). The review is limited to two questions: whether substantial evidence supports the Commissioner's decision, and whether the Commissioner applied the correct legal standards. *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009).

"Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008).[11] "[I]f supported by substantial evidence," the Commissioner's factual findings "shall be conclusive." 42 U.S.C. § 405(g).

## III. Discussion

Rivera raises two primary arguments on appeal. First, he argues that the Commissioner's decision is not supported by substantial evidence. Second, he argues that the ALJ committed legal error by rejecting certain medical opinion evidence, failing to focus the vocational expert on Rivera's seizure history, and declining to develop the record further regarding

---

[11] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

Rivera's seizures. For the reasons set forth herein, the Court agrees in part, and holds that the ALJ committed legal error by failing to develop a sufficient record regarding Rivera's seizure disorder.

"Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996). This duty exists even when the claimant is represented. *Id.* The Court must determine whether the ALJ has met this obligation before it can resolve whether the Commissioner's decision is supported by substantial evidence. *Echevarria v. Sec'y of Health & Hum. Servs.*, 685 F.2d 751, 755 (2d Cir. 1982); *see Hooper v. Colvin,* 199 F. Supp. 3d 796, 806 (S.D.N.Y. 2016) ("Whether the ALJ has met his duty to develop the record is a threshold question."). "Ultimately, the record as a whole must be complete and detailed enough to allow the ALJ to determine the claimant's residual functional capacity." *Fiedler v. Colvin*, 54 F. Supp. 3d 205, 216 (E.D.N.Y. 2014). The ALJ's failure to develop a sufficient record constitutes a legal error requiring remand. *See Rosa v. Callahan*, 168 F.3d 72, 80 (2d Cir. 1999).

Here, the ALJ failed to resolve an obvious gap in the record regarding Rivera's seizure disorder. The ALJ concluded that Rivera was able to "control his seizure disorder with

11

medication." Tr. 22. For that proposition, she cited to P.A. Modafferi's October 2019 report in which Modafferi stated that Rivera's seizures "*for the most part* are under control." *Id.* (emphasis added). But Modafferi provided no explanation of what "control" means. And the record does not resolve this question, either. It shows that Rivera had been having seizures with some frequency for approximately three years at the time of his hearing before the ALJ in December 2019. It also shows that those seizures persisted even as Rivera maintained the same medication regime for most of that period. On the existing record, we simply have no best — or even good — estimate of how frequently Rivera should be expected to experience seizures while working at any future job. Given that, the ALJ had an obligation to develop the record further.

During Rivera's hearing, the ALJ asked Rivera only two clarifying questions relating to his seizure disorder — first, whether the seizures were "partial seizures," and second, she asked him to repeat the basic details of his medication regimen (*i.e.*, schedule and doses). *See id.* at 39, 41. Otherwise, the ALJ asked Rivera no substantive questions about the seizure disorder or its effect on his capacity to function. The ALJ did not inquire, for example, as to Rivera's compliance with his medication regimen, which was central to her conclusion that Rivera was not disabled.

12

In *Chapman v. Commissioner of Social Security*, like here, the ALJ found that the claimant's seizure disorder was "controlled with medication." No. 19-CV-1873, 2020 WL 5763629, at *4 (E.D.N.Y. Sept. 27, 2020). But at the claimant's hearing, he reported that he was still experiencing seizures. *Id.* Despite that, the ALJ "refrained from asking Plaintiff any questions related to his seizure disorder." *Id.* Although the ALJ was "clearly aware of Plaintiff's significant history of seizures, as well as possible gaps in the record, the ALJ did nothing to gather a more complete picture of Plaintiff's disorder." *Id.* This error compelled remand for further development of the record regarding the claimant's seizure disorder. *Id.*

Here, too, the ALJ declined to seek additional information about Rivera's seizure disorder — namely, the *degree* to which it was controlled with medication — before rendering a decision. That information was necessary to determine the likelihood that Rivera's seizures would cause him to be absent from or late to work, or to take extended breaks during the workday — questions that bore directly on his capacity to work in a full-time role. *See, e.g.*, *Johnson v. Berryhill*, No. 17-CV-1651, 2019 WL 1430242, at *4 (D. Conn. Mar. 29, 2019). In

13

*Johnson*, when the ALJ asked the vocational expert about a hypothetical worker who "might have four to five seizures per month without warning," the expert testified that "frequent seizure activity on the job is not well-tolerated" and that a worker who would have five "absences" per month due to seizures could not maintain a job. *Id.*

The testimony of the vocational expert at Rivera's hearing underscored the importance of this omission. While the ALJ submitted hypotheticals to the expert that included certain *limitations* emanating from Rivera's seizure risk (*e.g.*, never climbing ladders), *see* Tr. 45-47, her questions contained no mention of the possibility that the claimant might sometimes be late to work or miss it altogether. In response, the expert opined that the claimant could perform certain widely available jobs, such as a mail sorter. *Id.* at 47. But when Rivera's counsel later asked about a claimant who would be absent from work twice a month, the expert responded that "there wouldn't be any work that he could do." *Id.* at 48. The expert likewise stated that a claimant who would arrive more than one hour late, or leave more than an hour early, multiple times per month would not be able to work. *Id.*

When an ALJ presents hypothetical questions to a vocational expert, there must be a logical connection between the hypothetical claimant's limitations and the actual

14

claimant's demonstrated impairments. For this reason, "[v]ocational testimony elicited by hypothetical questions that fail to relate with precision to the physical and mental impairments of a claimant is not substantial evidence on which an ALJ may base a decision." *Mathews v. Barnhart*, 220 F. Supp. 2d 171, 175 (W.D.N.Y. 2002). The Second Circuit has explained that a "vocational expert's testimony is only useful if it addresses whether the particular claimant, with his limitations and capabilities, can realistically perform a particular job." *Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981); *see also Mancuso v. Astrue*, 361 F. App'x 176, 179 (2d Cir. 2010). Here, the vocational expert needed some reasonable estimate of how often Rivera's seizure disorder would necessitate time off task, or a fuller absence, in order to provide useful testimony. *See Lahoz v.* Astrue, No. 09-CV-4523, 2010 WL 3310266, at *7 (E.D.N.Y. Aug. 19, 2010) (ordering remand on the ground that "[t]he ALJ asked the vocational expert to consider a hypothetical individual who lacked many of [the claimant's] salient characteristics"). To make such an estimate, the ALJ must develop a clearer record on the extent to which Rivera's seizures are "under control." *See* Tr. 411.

15

## IV. Conclusion

For the foregoing reasons, this case is remanded for further development of the record consistent with this order. The Clerk of Court is respectfully directed to close this case.

SO ORDERED.

                                       /s/ Eric Komitee

                                       ERIC KOMITEE

                                       United States District Judge

Dated:    April 21, 2023
             Brooklyn, New York